# Hanigan, Appellant, *v.* Philadelphia & Reading Railway Company.

*Negligence — Railroads — Crossings — Right angle collision — Wagon—Nonsuit.*

In an action against a railroad company to recover damages for the death of plaintiff's husband, who was killed at a grade crossing while driving a team across defendant's tracks, in consequence of being struck by a locomotive, a compulsory nonsuit was properly entered where it appeared that had plaintiff's decedent stopped, looked and listened, at a point twenty feet from the railroad tracks he must have been aware of the near approach of a locomotive, because at that point the view was unobstructed in the direction from which the train came for from 900 to 1,800 feet, but that he never-

theless proceeded across, in consequence of which the collision occurred.

Argued Feb. 5, 1917.    Appeal, No. 105, Jan. T., 1916, by plaintiff, from final order of C. P. Bucks Co., Dec. T., 1913, No. 26, refusing to take off nonsuit, in case of Lydia A. Hanigan v. Philadelphia & Reading Railway Company.    Before BROWN, C. J., MESTREZAT, STEWART, MOSCHZISKER and WALLING, JJ.    Affirmed.

Trespass to recover damages for the death of plaintiff's husband.

The facts appear in the following opinion of RYAN, P. J., sur plaintiff's motion to take off the nonsuit:

The plaintiff brings this action to recover damages for the death of her husband, who was killed at a grade crossing at Shelly, in this county, by a train of the defendant company.    At the place of the accident the double track of the defendant runs approximately north and south and the highway crosses it nearly at right angles.    The accident occurred about seven-forty in the evening of July 4, 1913.    The deceased at the time was driving two horses geared to a market wagon, the side curtains of which were down.    With a boarder at his house named Gillick, he occupied the only seat in the conveyance.    Back of them, on the floor of the vehicle, were seated his sister, Mrs. Hannah Costello, with her daughters, Gertrude, Frances and Kitty, her little son, Edmund, and a child named Ed. Kane.    The party was coming to Shelly from the deceased's farm, which was about a mile distant to the eastward of the point of accident.    The deceased had lived on the farm nearly seven years.    Approaching the crossing from this direction the highway descends a steep hill, but from the foot of the hill to the crossing it is a level road.    About forty feet from the crossing on the right is a cigar factory, just beyond which, toward the crossing, the deceased stopped the team, leaned forward and looked and listened.    At

this point, however, he could not see the track to the
north as the view was obscured by a growth of bushes
along the top of the bank of the cut of four or five feet
in depth through which the railroad is constructed.
From that point to a point beyond the bank of the cut,
about twenty feet from the first track the view from the
highway to the north is obstructed.  At that point a
clear and unobstructed view of the track northward to a
curve to the east could be had.  The distance to this
curve and the extent of the unobstructed view was esti-
mated by witnesses at from 400 to 500 yards to a quarter
of a mile.  Whether the deceased stopped a second time
at the point where he had an unobstructed view of the
track is not clear.  Gertrude Costello testified in chief
that he stopped and looked up and down the tracks
"right before he came to the crossing, right below the
cigar factory"......"forty feet from the tracks."  She
said (testimony p. 39) "He looked up and down the
track with the team and nothing came, so we went on and
we were just past the first track when we were hit, about
in the middle of the other track."  Mrs. Adeline Bauck
stated that she was seated upon a hotel porch opposite
the station, near the crossing, and saw the team come
down the hill.  In chief she testified (page 64) : "I was
sitting in my rocking chair on the porch and all at once
I saw the wagon coming down this hill and I saw a man
holding his line back and stop and look up and down.
Of course, where I sat you can see everybody that comes
down that hill, and I saw him until he got to the station
and I heard the train come and 'toot-toot,' and when the
accident happened I heard no bell, no whistle."  On
cross-examination (page 73) she testified inter alia as
follows:

"Q. When did he stop?  A. When he got down the hill.
Q. At the bottom of the hill?  A. Yes.  Q. As soon as
he struck the level?  A. Yes, sir.  Q. He didn't stop
again, did he?  A. He stopped, you know, he looked up
and down.  Q. Was he sitting on the seat of the wagon?

A. Yes. Q. He didn't stop again after stopping at the bottom of the hill? A. He stopped right there at the station. Q. You say he stopped at the bottom of the hill? A. That is near there.......Q. Did he stop again—stop his horse? That is the last time he stopped until he was struck. Is that it? A. Yes. Q. About a quarter of a square away. A. Yes. Q. Away from the track? A. Yes; then he stopped and just held his lines and looked up and down the tracks and they were clear and he went over. Q. But he only stopped one time altogether? A. Yes, it is just as good as stopped. Q. He stopped once? A. If you say so. Q. Do you say so? A. I can't say it over again.

"By the Court: Did he stop more than once? A. He stopped once, his horses, then right near the train he stopped again, just a second, and he looked up and down to see if the tracks were clear, then he went across the tracks and the train came around the bend." Whether the deceased did stop a second time or not, the fact is clear that there was a point twenty feet from the first or northbound track where there was an unobstructed view of both tracks up to the curve. If the deceased had stopped and looked here he could have seen a train approaching from the north for a distance of from about 900 to about 1780 feet. He drove across the first and upon the second track, when the team was struck by a southbound train. The wagon was demolished and the deceased and some of the other occupants of the conveyance were killed. The horses also were killed. The deceased's duty under the circumstances is thus stated in Haas v. Northern Central Ry. Co., 49 Pa. Superior Ct. 107, 109, following a long line of decisions of the Supreme Court of this State. "The rule that the traveler about to cross a railroad track must stop, look and listen is an absolute and unbending rule of law founded on public policy for the protection of passengers in railroad trains as much as travelers on the common highway, and such stopping, looking and listening must not be merely nominal or per-

functory, but substantial, careful and performed in good faith, with the accomplishment of the end in view. He must stop and look where he can see and will not be allowed to say that he did so when the circumstances make it plain that by the proper using of his common sense he must have seen his danger."

There is no question in the case at bar of what was the proper place to stop. It is clear from the testimony of the plaintiff's witnesses that the deceased stopped where he could not see. It is also clear that there was a point about twenty feet from the first track, beyond the bank of the cut, which was surmounted by bushes, where an unobstructed view in the direction from which the train came could be had. In Carroll v. Penna. Railroad Co., 12 W. N. C. 348, 349, the Supreme Court says, "It is in vain for a man to say that he looked and listened, if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive." It is equally vain for others to say so where his actions indicate that he did not see the approaching train. If, in the case at bar, the deceased had looked and listened at the point twenty feet from the track, where the view was unobstructed, he could have both seen and heard the approach of the train that collided with his team. To drive in front of an approaching train which could have been seen and heard from a place of safety in time to avoid a collision is negligence per se. In Pennsylvania R. R. Co. v. Beale, 73 Pa. 504, 509, SHARSWOOD, J., declared, "There never was a more important principle settled than that the fact of the failure to stop immediately before crossing a railroad track is not merely evidence of negligence for the jury, but negligence per se, and a question for the court: North Pennsylvania R. R. Co. v. Heileman, 13 Wright 60." "Where there is a doubt as to the proper place to stop, look and listen, as a general rule such a question will be referred to the jury. But where there is no such doubt; where the deceased stopped at a point where he could not see, it is for the court to deter-

mine whether it was a proper place": Urias v. Penna. R. R. Co., 152 Pa. 326. This rule is quoted and applied in Kinter v. R. R. Co., 204 Pa. 497. While it is said that the rule laid down in Carroll v. Penna. Railroad Company, supra, applies to clear cases only, we consider this such a case and conclude that the nonsuit was properly entered.

The trial judge entered a compulsory nonsuit which the court subsequently refused to take off. Plaintiff appealed.

*Error assigned* was in refusing to take off the nonsuit.

*Hugh Roberts,* for appellant.

*Harman Yerkes,* for appellee.

PER CURIAM, March 19, 1917:

This judgment is affirmed on the opinion of the court below refusing to take off the nonsuit.